UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

INNOVAPORT LLC

          Plaintiff,

v.                                             Case No. 21-cv-00789-bhl

IKEA NORTH AMERICA SERVICES LLC

          Defendant.

---

## CLAIM CONSTRUCTION ORDER

---

      This patent infringement action deals with a product location system that is the subject of patents owned by Plaintiff Innovaport LLC. Innovaport alleges that a mobile phone application and website maintained by Defendant IKEA North America Services LLC infringe Innovaport's rights under U.S. Patent No. 8,775,260 (the '260 Patent) and four related patents. The parties have filed claim construction briefs, offering competing interpretations of multiple terms used in the patent claims that the parties contend are material to their dispute. This Order sets forth the Court's preliminary construction of these terms.

### PATENT BACKGROUND

      The '260 Patent describes a "system and method" for locating products in a store, via two main features: a "first user interface" and an "inventory information unit" (IIU). (ECF No. 42-1 at 1.) Described simply, the system provides for a user-sent signal to be sent to the interface— such as from a shopper looking up where in the store to find candy bars—which in turn sends a corresponding "product inquiry signal" to the IIU and its database. The IIU then sends a location information signal back to the interface, which in turn sends an output signal ("the candy bars are on aisle 3") back to the user. (*See id.*) The four related patents, U.S. Patent No. 8,787,933 (the '933 Patent), U.S. Patent 9,489,690 (the '690 Patent), U.S. Patent No. 9,990,670 (the '670 Patent), and U.S. Patent No. 7,231,380 (the '380 Patent) correspondingly describe a system and method for locating products in a store with both a user interface and IIU. (ECF No. 42-2 at 1; ECF No. 42-3 at 1; ECF No. 42-4 at 1; ECF No. 42-5 at 1.)

# CLAIM CONSTRUCTION PRINCIPLES

The Patent Act requires that a patent application include a specification for the proposed patent. 35 U.S.C. § 111(a)(2)(A). The Act provides that the specification shall contain:

> a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention.

35 U.S.C. § 112(a). Section 112(b) requires the specification to "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter" regarded as the invention. These two paragraphs "frame the issue of claim interpretation." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).

In the end, however, the claim terms themselves are preeminent. "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Id.* (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). A patent's protections extend to the "full scope" of the claims and are not limited to preferred embodiments in the specification. *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009); *see also Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) (cautioning "against limiting claims to a preferred embodiment."). While claims must be read in the context of the specification, a court must not read a limitation from the specification into the claims. *See Blazer v. Best Bee Bros. LLC*, 2022-1033, 2022 WL 16954848, at *4 (Fed. Cir. 2022).

Like the interpretation of a contract, the construction of patent claims is an issue of law for the Court. Accordingly, when the resolution of a patent infringement or patent validity dispute depends on the meaning of certain claim language, the Court must resolve the meaning of any disputed claim language. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 376 (1996). Mindful of the Court's limited jurisdiction, it should only provide a construction of language that is in fact "in controversy, and only to the extent necessary to resolve the controversy." *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (citing *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)).

As with contract interpretation, the Court's reading and definition of claim language must be centered on the words of the claim itself. *See Bell Commc'ns Rsch., Inc. v. Vitalink Commc'ns*

*Corp.*, 55 F.3d 615, 619–20 (Fed. Cir. 1995). The Court gives those words their "ordinary and customary meaning" within the context of a patent and thus as the words would have been used and understood in the field of the invention by a person of ordinary skill in the art. *Phillips*, 415 F.3d at 1312–13. The Court looks to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," including the claim terms themselves, along with the patent specification and the documents contained in the patent prosecution history. *Id.* at 1314 (quoting *Innova*, 381 F.3d at 1116).

In addition to this "intrinsic" evidence, the Court may also consult extrinsic sources, including expert and inventor testimony, dictionaries, and learned treatises. *Id.* at 1317. Reliance on extrinsic evidence should be done with caution, however, because it is generally considered "less reliable." *Id.* at 1318. While it may be used to "provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field," it is prone to misuse. *Id.* at 1318–19. It is thus potentially helpful but "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.

## DISPUTED CLAIM TERMS

The parties have identified seven material claim terms for which they have competing constructions. (ECF No. 45 at 16–17; ECF No. 47 at 8–17.) Other than their first dispute, concerning the term "user interface," the parties disagreements boil down to a single issue—whether the patents describe and are limited to searches at a store by customers actually in that store. As explained below, the Court largely accepts Innovaport's position on the first dispute but agrees with IKEA on the balance.

1. **"User Interface."**

The parties first dispute the meaning of the term "user interface," one of the central concepts described in the patents at issue. According to Innovaport, this term does not have any special meaning in the context of the patents at issue and should be given its plain and ordinary meaning. (ECF No. 45 at 18.) Innovaport would thus define the terms as "a conduit between human and computer interaction." (*Id.*)

IKEA, on the other hand, insists that "user interface" must mean a physical device. (ECF No. 47 at 8.) It points to the embodiments disclosed in the specification, all of which are physical devices. (*Id*.) It argues that while a user interface may include software, it cannot be software alone, but must include some physical device. (*Id*.) IKEA thus argues that Innovaport's construction impermissibly broadens the patents "to encompass subject matter that the patentee never envisioned." (*Id*. at 10.)

In reply, Innovaport points to specification language describing the user interface as "allowing for input and output between the user interface and customers" and" facilitat[ing] interaction with customers," but not limiting it to a physical device. (ECF No. 45 at 18.) Innovaport also highlights another term in the patents—"input device"—which it contends is a physical device, but distinct from the "user interface." (*Id.* at 18–19.) Innovaport argues that IKEA's construction improperly collapses these two terms, rendering them one and the same. (*Id.*)

Innovaport has the better argument on the construction of this term. Nothing in the claim language or specification limits "user interface" to physical devices. While the exemplar embodiments described in the patent use physical devices, neither the claim language nor the context in which the term is used in the entire patent limits the invention in this way and the Court will not imply such a limitation into the claim when language imposing such a limitation is not present. *See Comaper*, 596 F.3d at 1348. IKEA's invitation to do otherwise would have the Court improperly limit the claims based on preferred embodiments in the specification, a result the Federal Circuit has repeatedly cautioned against. *See Astrazeneca AB v. Mut. Pharm. Co.*, 384 F.3d 1333, 1340 (Fed. Cir. 2004) ("[I]t is of course improper to limit the claims to the particular preferred embodiments described in the specification . . . ."); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1273 (Fed. Cir. 2001) ("[I]t is generally impermissible to limit claim terms by a preferred embodiment or inferences drawn from the description of a preferred embodiment."); *Akami Techs., Inc. v. Limelight Networks, Inc.*, 805 F.3d 1368, 1375 (Fed. Cir. 2015) ("Claims are not necessarily and not usually limited in scope simply to the preferred embodiment.") (quoting *RF Del., Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1263 (Fed. Cir. 2003)).

The Court will make one change to Innovaport's proposed construction, however. Rather than using the words "conduit between," the Court will define user interface as "a means for conducting human and computer interaction." The word "conduit" begs further definition itself;

the Court's language will be more readily understood by a layperson jury. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1359 (Fed. Cir. 2008) ("A claim construction order always dictates how the court will instruct the jury regarding a claim's scope.").

> **2. "A Method of Providing Product Location Information Within a Store," "A Method of Providing Product Location Information Within a First Store," "A System for Providing Product Location Information Within a Store" and "A System for Providing Product-Related Information Within a Store."**

The parties' next series of disputes relate to four additional claims, with their disagreements sharing a common disagreement over whether methods claimed describe inquiries, and not just the products themselves, that take place *within a store*. Innovaport argues that the terms "A Method of Providing Product Location Information Within a Store" and "A Method of Providing Product Location Information Within a *First* Store" (emphasis added) should be given their plain and ordinary meanings. (ECF No. 45 at 20–24.) It then proposes both terms be construed to mean: "a method of providing information regarding where a product is located within a store" and "a method of providing information regarding where a product is located within a first store." (*Id.*)

IKEA suggests an additional limitation. It points to the claim preambles, specification and claim language, and the prosecution history and maintains that each term be defined in terms of inquiries concerning products and product-related information in a store and for which the inquiries themselves take place "*within that store*." (ECF No. 47 at 11–16.) IKEA acknowledges the general principle that preambles are presumed to be non-limiting but insists the preambles here "provide the antecedent basis" for the meaning of the basic terms "a store" and "a first store" as used repeatedly in the claims. (*Id.* at 12.) It similarly maintains that the claim terms must be interpreted in the context of the entire patent, including the specification, which, IKEA insists, demonstrates that the systems and methods claimed were intended to operate for the benefit of customers "within a store." (*Id.* at 12–14.) It points to the patentee's chosen language in the patent titles and in the Field of the Invention and Background of the Invention sections that explain the method in the context of a person or customer searching at or within the store. (*Id.*) It urges that the same understanding is supported by the exemplary store identified in the patents. (*Id.* at 13.)

Most powerfully, IKEA cites disclaimers during the patent prosecution process in which the patentee distinguished prior art titled "Method of executing an electronic commerce sale from an affiliate web site" by emphasizing that the claimed invention was limited to customers "within"

a store. (*Id*. at 15.) IKEA provides a copy of correspondence with the patent examiner in which the patentee stated:

> The Applicant's claimed invention relates to a system for providing information regarding the location of products <u>within a store</u> to customers who are <u>within that store</u>, where the customers are interacting with the system by way of a plurality of user interfaces <u>within that store</u>. This is a fundamentally different system, with a fundamentally different primary purpose, than that of Bollay. As best as the Applicant can determine, Bollay does not disclose or suggest a system for allowing customers who are within a store to utilize a plurality of user interfaces within that store to obtain information regarding the locations of products within that same store. That is, as best as the Applicant can determine, Bollay is not at all directed toward an in-store system that provides product location information to customers within that store so that those customers can physically find those products within the store.

(*Id.*) (emphasis in original). IKEA insists this characterization makes "clear that the applicant viewed the invention's point of novelty to be in-store activity that is distinct from remote, online methods." (*Id.*)

In reply, Innovaport points to caselaw embracing the general principle that a preamble does not limit the scope of the claims and argues there is "no indication in the claims, specifications, or prosecution histories" of the patents that "it is necessary or essential for the customers to be within a store to practice the claimed systems or methods." (ECF No. 48 at 9–10.) Innovaport also argues that IKEA's proposed construction renders language in two of the claims, claim 9 of the '260 patent and claim 1 of Patent '315 superfluous. (*Id.* at 12–13.) Finally, Innovaport argues that IKEA is misreading the patentee's correspondence with the patent examiner, correspondence that it insists concerned claims 4-18 of the '315 patent, and that all three independent claims of the '315 patent include the term "customers within the store." (*Id.* at 13–14.) In its response brief, IKEA notes similar disclaimers concerning the '690 and '670 patents and argues this shows the patentee three times narrowed his claims by unambiguously narrowing the scope of his claims to achieve allowance. (ECF No. 49 at 8–9.)

The Court agrees with IKEA. Looking at the claims in their context, their intended scope concerns inquiries made within a store concerning products and product-related information within that store. This is confirmed by reading the claims and specification in their entirety. The claims and specifications for all five patents focus on solving the problem of assisting customer inquiries within a store. Nothing in any of the claims (or their specifications) suggests that the novel system

or method proposed was intended to cover inquiries taking place outside the store. And, indeed, remote usage and shopping would appear to be a much different animal not contemplated by the applicant or his patents. The Court is also persuaded by the patent prosecution history, in which the patentee did not just mention in passing, but emphasized, that the claims concerned inquiries within a store. And he made this distinction not just with respect to the '315 patent, but with respect to two others as well. In context, the record is clear that this claim term was intended to mean inquiries concerning products within a store made within that store. Accordingly, the Court will adopt IKEA's proposed construction.

The parties offer essentially identical arguments concerning the parallel terms: "A System for Providing Product Location Information Within a Store" and "A System for Providing Product-Related Information Within a Store." For the same reasons just stated, the Court will adopt IKEA's proposed construction on these terms too.

> **3. "Providing a Product Location Information Signal in Response to the Product Location Inquiry Signal" and "Providing a Product Location Information Signal that is at Least Indirectly Responsive to the Processed Product Location Inquiry Signal."**

The parties also affirmatively dispute the claim terms "Providing a Product Location Information Signal in Response to the Product Location Inquiry Signal" and "Providing a Product Location Information Signal that is at Least Indirectly Responsive to the Processed Product Location Inquiry Signal" in Claim 1 of the '690 Patent and Claim 1 of the '670 Patent respectively. Innovaport again argues that both terms do not have any special meaning in the context of the patents at issue and both should be given their plain and ordinary meaning. (ECF No. 45 at 24–27.) Innovaport would not define either term further and relies on the language used in the claims themselves. (*Id*.)

As with the preceding terms, IKEA suggests that these terms be limited to providing information to in-store customers. (ECF No. 47 at 16.) It points to the context of their use in the claims and specifications, highlighting language describing the patents as providing product location information "to customers (or employees or others) in stores and other retail centers." (*Id*.) And it maintains that the patents nowhere suggest an intent to bring the use of "out-of-store devices or websites . . . within the ambit of the purported invention." (*Id*.) IKEA also points again to statements made during the prosecution process in which the patentee distinguished the claims from prior art by highlighting and disclaiming in-store uses. (*Id*. at 16–17.)

For largely the same reasons explained in the prior section, the Court agrees with IKEA. The Court must read the claims and claim terms in context. *Phillips*, 415 F.3d at 1313. Read as a whole, the patents make clear that the method or process being patented relates to inquiries made within a store concerning products and product-related information within that store. It follows therefore that these two "providing signal" terms must be interpreted in this way.

## "UNDISPUTED" TERMS

Innovaport identifies six additional claim terms for which it proposes constructions that it calls "undisputed." (ECF No. 45 at 10–11.) IKEA contends that Innovaport's proposed constructions for these terms "are either flawed or unnecessary." (ECF No. 49 at 11.) The parties agree that all six terms should be given their plain and ordinary meaning, (ECF No. 45 at 10; ECF No. 49 at 11), but IKEA maintains that the terms are unambiguous and thus additional construction is unnecessary. (ECF No. 49 at 11–12.)

The Court agrees with IKEA. The terms themselves are within the common understanding of an average person. Innovaport has offered no reason for believing otherwise. Accordingly, rewording the language used in pursuit of clarity in claim construction would serve no purpose (other than potentially introducing new and unintended issues to the dispute). The Court will rely on the terms Innovaport used in drafting the patents themselves. *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) (adopting the plain and ordinary meaning of claim terms without further construction).

## SUMMARY OF THE COURT'S CONSTRUCTION RULINGS

### *DISPUTED TERMS*

| Claim Term | Innovaport's Construction | IKEA's Construction | Court's Construction |
|---|---|---|---|
| **User Interface** | A conduit between human and computer interaction | A physical device for human interaction | A means for conducting human and computer interaction |
| **A Method of Providing Product Location Information Within a Store** | A method of providing information regarding where a product is located within a store | A method of providing product location information within a store to customers who are within that store | A method of providing product location information within a store to customers who are within that store |

| Claim Term | Innovaport's Construction | IKEA's Construction | Summarized points of clash |
|---|---|---|---|
| **A Method of Providing Product Location Information Within a *First* Store** | A method of providing information regarding where a product is located within a first store | A method of providing product location information within a first store to customers who are within that store | A method of providing product location information within a first store to customers who are within that store |
| **A System for Providing Product *Location* Information Within a Store** | A system of providing information regarding where a product is located within a store | A system of providing product location information within a store to customers who are within that store | A system of providing product location information within a store to customers who are within that store |
| **A System for Providing Product-*Related* Information Within a Store** | A system of providing information regarding a product that is located within a store | A system of providing product-related information within a store to customers who are within that store | A system of providing product-related information within a store to customers who are within that store |
| **Providing a Product Location Information Signal in Response to the Product Location Inquiry Signal** | Plain and ordinary meaning (not limited to location of customer) | Providing a product location information signal in response to the product location inquiry signal while the customer is in the store | Providing a product location information signal in response to the product location inquiry signal while the customer is in the store |
| **Providing a Product Location Information Signal that is At Least Indirectly Responsive to the Processed Product Location Inquiry Signal** | Plain and ordinary meaning (not limited to location of customer) | Providing a product location information signal that is at least Indirectly responsive to the processed product location inquiry signal while the customer is in the store | Providing a product location information signal that is at least Indirectly responsive to the processed product location inquiry signal while the customer is in the store |

## UNDISPUTED TERMS

| Claim Term | Innovaport's Construction | IKEA's Construction | Summarized points of clash |
|---|---|---|---|
| **Input** | Data that is entered | Plain and ordinary | Plain and ordinary |

|  | into and received by a computer | meaning | meaning without further construction |
|---|---|---|---|
| **Product Location Inquiry or Location Inquiry** | A keyword search to find the location of a product within a store | Plain and ordinary meaning | Plain and ordinary meaning without further construction |
| **Product Location Information** | Data indicating the location of a product within a particular store | Plain and ordinary meaning | Plain and ordinary meaning without further construction |
| **Information Linking the Product with an Other Product in a Cross-Referential Manner** | Data linking a product to a different type of product | Plain and ordinary meaning | Plain and ordinary meaning without further construction |
| **Mobile Device** | A portable device | Plain and ordinary meaning | Plain and ordinary meaning without further construction |
| **Product Availability Information** | Data indicating whether a product is in stock at a particular store | Plain and ordinary meaning | Plain and ordinary meaning without further construction |

## CONCLUSION

The parties' disputed claim language is construed as noted in the charts and for the reasons set forth above. Consistent with the Scheduling Order, the parties are directed to meet and confer concerning specific dates for the completion of fact and expert discovery, including the exchange of expert disclosures, and the filing of dispositive motions. (ECF No. 31 ¶11.) Counsel are directed to file a joint report detailing the outcome of their conference and proposing a schedule no later than 14 days after entry of this order.

Accordingly,

**IT IS HEREBY ORDERED** that the parties' disputed claim language is construed as noted in the charts above.

**IT IS FURTHER ORDERED** that the parties are directed to meet and confer concerning specific dates for the completion of fact and expert discovery, including the exchange of expert disclosures and the filing of dispositive motions. Counsel must file a joint report detailing the

outcome of their conference and proposing a schedule no later than **14 days** after the entry of this order.

Dated at Milwaukee, Wisconsin on February 21, 2024.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge